Thank you, Your Honors, and I apologize. My names are very difficult to pronounce. I understand the struggle. I will attempt to reserve seven minutes of my time. I represent Klickitat County and the rest of the county defendants on this appeal, and may it please the Court. Your Honors, this case is about whether the parties to the Yakama Treaty of 1855, and later on, the United States Congress, actually meant what they said. In holding the Glenwood Valley as inside the Yakama Reservation, the District Court disregarded the plain language of the treaty, as well as the boundary that the treaty parties drew on the treaty map, both of which require the boundary to touch the Pisco-Klickitat Divide. The District Court further erred by ignoring 75 years of Yakama Nation's own affirmative boundary claims, all of which exclude Glenwood from the reservation, and in failing to acknowledge Congress's express intent to settle the Yakama Nation western boundary by adopting Yakama's own boundary claim in 1904. Now, it's well settled. Courts cannot rewrite treaties. Instead, they have to apply all unambiguous terms and interpret the treaty as the parties would have understood it at treaty time. In this case, that's 1855. The Yakama Treaty requires that the boundary touch, and then traverse, the divide between the Klickitat River and the Pisco River, which is now called Toppenish Creek. The location of this divide was established at trial by Yakama Nation's own hydrologist and a GIS personnel using Yakama Nation's hydrology map, which is at SER 355. I have a blowup of that map behind me, and I apologize if you can't see everything on it, but I have marked where those witnesses located the Pisco-Klickitat Divide with a nice big red X here, and importantly, it's east of Mount Adams and north of the main forks of the Klickitat River, and the divide is actually located right at the headwaters of Tepe Creek, if that helps. Counsel, can I ask you a big picture question before you get too detailed? It's fair to say, isn't it, that the two parties to this treaty are currently all in agreement and have been for a number of years as to where the boundary is? Yes, Your Honor, that is fair to say. And it's completely inconsistent with your determination of what you say the boundary is, correct? That's also correct, Your Honor. And so how can you reasonably argue that the terms of the treaty were unambiguous as to what the boundary was, and that the terms are consistent with your interpretation of the boundary, if both parties to the treaty now are saying, nope, this is the western boundary, not what the county says the western boundary is? Well, this is not much unlike the Sioux Nation case, where both the tribe and the United States in that case agreed that the issue did not establish diminishment, but yet the United States Supreme Court still found it. The treaty interpretation must be done as the parties understood it at treaty time, so it's really not relevant what those parties say about it now. We have to look back and see, what did the parties understand in 1855? And again, it's de novo here, so the court's job is to look at the treaty and interpret it as the parties understood it at the time they enacted it. Could I ask you, the boundary you're proposing, that you say comports with the treaty's call for crossing the relevant spur and divide, is different from what every other surveyor ever drew as the boundary? Am I right about that? Well, it is somewhat. So we have the Schwartz survey in 1890. Schwartz actually took the boundary in reverse, so he reversed the calls and he moved from east to west. The only thing that Schwartz erred was that instead of crossing the Klickitat River here, Schwartz took his boundary north. His error was in not crossing the Klickitat. I think the answer is no surveyor ever drew the same line that you're drawing now. That's correct. That's absolutely correct. But had Schwartz crossed the Klickitat River, he would have actually nailed the boundary as required by the treaty. But it doesn't get us around the fact that the treaty unambiguously has two calls that require the boundary to go to the Pisco-Klickitat divide, and the location of that divide is not subject to dispute. The court cannot disregard plain language, and it cannot rewrite the treaty like it is done. Why did all these surveyors who are out there—I mean, we unfortunately aren't able to go hike this area and understand it ourselves, but the surveyors presumably did. So why should we think that your line that none of them drew could possibly be right? Well, there were a number of issues. For instance, most of the surveyors weren't actually asked to interpret the treaty. I mean, Schwartz was asked to interpret the treaty. He did it in reverse, failed to cross the Klickitat. That was his error. But after Schwartz, Barnard was sent out to interpret the treaty as the Yakima had understood it. So Yakima, in response to the Schwartz survey in 1890, spent two decades protesting that survey and making affirmative claims of the boundary that they believed was the true and correct boundary. Barnard was sent out to investigate Yakima's claims. So Barnard's survey is a reflection of what Yakima had claimed at the time, not necessarily an interpretation of the treaty. It was based as a component of reading the treaty and also taking into account what Yakima had been claiming for decades. But, again, the court's obligation in interpreting the treaty here is to interpret the plain language and cannot ignore the plain language nor rewrite the plain language that's there. That's well established throughout Supreme Court precedent in these cases as well as the Ninth Circuit's precedent. Counsel, how can the plain language be unambiguous if, like I said, I understand your point that your argument is that what matters under the case law is what the parties believed at the time of the treaty. But how can you say that it's unambiguous language if the parties are now saying that it's a different location? You've had this boundary moving for a number of years. How can you reasonably argue that it's unambiguous? Well, it's unambiguous because there's only one reasonable interpretation. The reason that the district court determined that the treaty was unambiguous is because it applied a technical definition of the word spur rather than interpret the word spur as the parties understood it. In doing so, it rendered the next two calls impossible. But if an interpretation of the treaty that renders it impossible is by definition not plausible and cannot create an ambiguity as a matter of law, the only evidence in the record is what the parties understood for the word spur or the treaty itself. The treaty map, which also shows the boundary going along the Pisco-Klickitat Divide, as well as Governor Stevens' contemporaneous descriptions in his railroad survey reports in which he describes the spur between the Pisco and Klickitat River as an extensive range of mountains extending east from the Cascades and connecting to the Pisco-Klickitat Divide. This is the only interpretation that gives meaning to all the calls of the treaty. Just as Yakama Nation argued in Cree v. Waterbury, the court must do. Now, and again, we're asking, why are we here? Well, that's the error. That's the principal error, this definition of the word spur. But even if we were to determine that the word spur was ambiguous, the court still can't avoid the clear and unambiguous requirements for the Pisco-Klickitat Divide. When you have an ambiguous term, you don't make the clear terms bend to the ambiguous. You interpret the ambiguous to be consistent with the clear. That's what our Supreme Court requires. Could I ask you about your argument about the 1904 Act? So am I right that your diminishment argument depends on interpreting the Act to accomplish a diminishment, even though the Act clearly shows the bigger boundary that was at issue at the time? So let me take that apart a little bit. The county doesn't think this is a diminishment case. This case is about Congress settling a boundary dispute. There were a series of surveys throughout history that established variations of Yakama's boundary. Following the Schwartz survey, like I said, in 1890, Yakama submitted numerous petitions and attestations in protest to that boundary. Congress spent 15 years investigating Yakama's claim, which culminated in the 1904 Act, where Congress, by its plain language, said, We adopt Yakama's claim to 293,000 additional acres. We apply those acres to the reservation. And we direct the Department of Interior to mark, define, and survey this new western boundary. On the plain language, this established a western boundary. And under McGirt, this is enough. McGirt clarifies that even in a diminishment case, which we don't believe this is, but even in a diminishment case, the fundamental duty of the court in interpreting legislative acts is to simply ascertain and follow the original meaning of the law. We think the plain language of the 1904 Act clearly establishes Congress's intent to set the boundary. And if there's any uncertainty about that, we look to the Congressional Committee reports, which are outside the statute, but they're the best evidence of Congressional intent. In those Congressional Committee reports, both for the Senate and for the House, they're essentially identical, they both begin by describing the disputed western boundary. But they don't talk about the Track D at all, right? That's correct. There's no discussion about Track D, because at the time, no one had ever thought that Track D was included. Yakima had never claimed it. The United States had never claimed it. No one had ever considered the Glenwood Valley as part of the reservation. The map was lost, right, at that time? That's true, but no one's arguing that Yakima Nation would have required the treaty map to know its boundaries. In fact, Yakima's own expert testified that these are things that they would hold true and pass along generation to generation. So to assume that Yakima would have needed the map to know its boundaries, not only is that outside the record, but it's not a reasonable premise. Well, except that, counsel, at the time that the treaty was being negotiated, isn't it fair to say that the map was used as an illustration to explain the boundaries to the nation because they were not English speakers primarily, right? I mean, the negotiation was in a language that they did not know and did not understand, and so the map was a necessary illustration for them to better understand what the boundary would be. I think you're absolutely correct. Governor Stevens utilized these large-scale maps for that exact purpose, to make sure that the boundaries that were being negotiated were properly communicated to the tribes. And in this case, the treaty map unequivocally excludes Glenwood. If you follow the boundary, it goes just south of Mount Adams, near due east, actually a little bit north, to the Pisco-Klickitat Divide. You see where the Pisco and the Klickitat Rivers come together and the boundary splits. It splits right above White Creek on the treaty map. Except that every survey after the treaty map was discovered, so every survey that had the benefit of the treaty map, concluded that Track D was within the reservation, right? Well, so I think that's a little misnomer because if we're talking about Calvin, Calvin did a survey, but he was instructed to survey Track D. He was told to explore the boundary of Track D to determine whether or not a spur existed there. He was never instructed to interpret the treaty, and that's the misnomer. In fact, Calvin testified at the ICC, and we give the ER site in our brief. Calvin testified at the ICC. I never looked for the Pisco-Klickitat Divide. I never went anywhere near it because I was instructed to go around Track D. And everything that followed that is the same. Sherler was not instructed to interpret the treaty. He was instructed to survey Track D. And no one here is accusing either Calvin or Sherler of inaccurately surveying Track D. That's not the issue. Neither one was asked to interpret the treaty. The ICC interpreted the treaty, didn't it? The ICC, as part of its proceedings, was asked to interpret the treaty, yes. But the ICC can't set a boundary. It has no jurisdiction to do that. But we have to think that they got it wrong. You have to convince us that it's so unambiguous, and yet they got it wrong. The ICC did absolutely get it wrong. And I think the ICC was operating not only on a very much incomplete record in terms of what the Accommodation understood its own boundary to be. Many of the petitions and ask testations and, frankly, testimonies that we have in the record here before you were not before the ICC. But also, the ICC didn't apply the legal principles that have been established since that time. All the Supreme Court cases and Ninth Circuit cases that have clarified how we interpret treaties, specifically that we have to honor these unambiguous provisions. You can't take an interpretation that you think is ambiguous and then change the words later on to make it fit that interpretation, which is exactly what the district court did here. It fundamentally erased three separate calls for the Pisco River and replaced those with calls for the White Salmon River. Every treaty time description describes the boundary in relation to the Pisco. None of them describe it in relation to the White Salmon. In fact, the White Salmon wasn't mentioned in Stephen's descriptions of the council, and it's nowhere mentioned in the treaty. Counsel, Judge Gould, if I may please interject a question on the theory here. And I apologize if it just reveals that I'm missing something. I didn't follow something earlier. But is the critical intent here the intent of Governor Stevens and the intent of the tribe when they entered the treaty? Or is it the intent of Congress in acting subsequent legislation relating to boundaries? It's actually both, Your Honor. When we interpret the treaty, the relevant intent that we have to discern is the treaty party at the time of the treaty. But if we are to determine that Congress subsequently changed the boundary, we look to Congress's intent at that time. So we believe, the county asserts, and we think the plain language of the treaty establishes that the original boundary of the Yakama Nation Reservation excludes Glenwood based on what the parties wrote in the treaty, based on what was drawn on the treaty map, and based on Yakama's uncontested understanding for the first 75 years of its existence. But even if the court were to agree with the district court that Yakama and the United States intended to include Glenwood, we think the boundary should still be reversed because in 1904 Congress set a new boundary for the express purpose of settling the boundary dispute with Yakama. That part is clear from those congressional committee reports. The court nor Yakama even addressed those statements. And I think I just exceeded my time, and I would like to reserve some time for rebuttal if I may. Yes, why don't we proceed to the appellee's argument for your planning purposes. Although your time was used up, we'll give you four minutes for a rebuttal argument. Thank you, Your Honor. Okay. I guess now it's Mr. Jones. Thank you, Your Honors, and may it please the court. My name is Ethan Jones. I represent the Confederated Tribes and Bands of the Yakama Nation. This matter was decided long ago. The Indian Claims Commission found that both parties to the Treaty of 1855 intended to include Track B within the Yakama Reservation. The United States has not treated the 1904 Act as changing those reservation boundaries. As a result, the district court's decision affirming Track B's reservation status was well-supported, well-reasoned, and should be affirmed by this court. There are three main points I'd like to make today. First, under the Treaty Canons of Construction, the Yakama Nation's ancestors would have naturally understood their treaty to include Track B within the Yakama Reservation. Second, applying the Diminishment Framework, Congress did not express a clear intent to diminish the Yakama Reservation's boundaries in the Act of December 21, 1904. And third, the uniform understanding of both parties to the treaty is that the treaty included Track B within the Yakama Reservation in 1855 and that it remains within the Yakama Reservation today. But first, I'd like to address a few of the arguments that were raised by the county. The county argues that Article II of the treaty is not ambiguous. Now, this is counter to the position that they took at ER 1476, where they said that Article II was neither plain nor dispositive. But regardless, Article II of the treaty is ambiguous. It's ambiguous in its calls for the southwestern boundary of the Yakama Reservation. It says that the western boundary extends down the main ridge of the Cascades, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco Rivers. There is no spur off the main ridge of the Cascades, south of Mount Adams, that separates the Klickitat and Pisco Rivers. It doesn't exist. And that's a factual finding that was entered by the district court at ER 15 that should be upheld unless clearly erroneous, and the county has not made a showing that that was a clearly erroneous finding. Also, the county has spoken about other elements of this southwestern boundary. There are three elements to the southwestern boundary description. There's this spur that I just discussed that does not exist. So the first southwestern call is an impossible call. The second calls for following the spur to the divide between said rivers. Again, the spur doesn't exist, so you can't follow it to the divide between the rivers. Another impossible call. And the third calls for traversing the divide between the Pisco and the Klickitat to the Simcoe Mountains. And again, that divide does not connect to the Simcoe Mountains. So all three elements of the southwestern boundary are ambiguous. The county also argues for a boundary that appears nowhere in the 165-year record of this case until the county drew it in 2019. It was not drawn by a topographer or a cadastral engineer or a surveyor. It was not drawn by the county's witnesses or the county's expert witness. The county's expert witness actually said that the boundary was the Campbell-Barnard line intended by the treaty parties, and that you can see that line and their experts drawing at ER 1476. You can see that testimony at ER 148 to 153. So the county is actually contradicting their own expert witness as to what was intended by the parties to the treaty. The historical record, or excuse me, there is no credible supporting testimony for this boundary that the county has put forth either. The only witness that was offered to testify as to this boundary was their expert witness, whom the district court deemed to not be credible, and that credibility determination is also a factual finding that should be upheld unless clearly erroneous. And again, the county has not meaningfully disputed that factual finding. And this boundary violates the Treaty of 1855 because it departs the main ridge of the Cascades on no readily identifiable continuous feature, and it traverses 20 miles across the Klickitat River Divide crossing streams, lakes, rivers, the Klickitat River Canyon before it briefly touches this divide. And then it leaves the divide. And again, following no geographic feature whatsoever, it goes across the entire Status River watershed down to the Simcoe Mountains, conveniently excluding almost the entirety of Klickitat County from the Yakima Reservation. Opposing counsel also said for the first time today, and this has never come up in briefing, that a portion of the Schwartz survey is somehow correct. The Schwartz survey has been thoroughly debunked throughout the record of this case. And neither the Yakima Nation nor the United States at any point in the record has ever agreed with the boundary that's being put forth by the county here. The district court rejected this 2019 boundary line, and we would ask that this court reject that line as well. Could I ask you to address the point that the Yakimas didn't include Track D in their understanding of the reservation until the 1920s? Yes, Your Honor. I think that that is a mischaracterization of the record. So first of all, the southwestern boundary is not surveyed until 1890. So the first time that it's surveyed is with the Schwartz survey in 1890. And the Yakima Nation responded to that survey with outrage because it cut the reservation in half, essentially, including Track D in the western portion. And if you look at the superintendent's reports at ER 1761 to 1775, there is year after year objections from the Yakima Nation that the boundaries of its reservation were not properly surveyed. When the Crow Flathead Commission... Did it suggest a boundary, though, that would include Track D? Well, Your Honor, at that point, I mean, hundreds of thousands of acres were improperly excluded from the reservation, including Track D. So what you're looking for is the first time that the Yakima Nation is specifically talking about Camas Prairie and this history. In 1913, there was a record of a discussion, and you can see this discussed in testimony at ER 826, about Camas Prairie being included in the reservation. There are superintendent notes from 1923 about discussions with the Yakima Nation members. That's at ER 2661, where they were discussing... Right, but that's a long time after. I mean, there's a significant gap in time, as I understand it, where it doesn't seem like the Yakima were drawing anything that would look like including Track D or arguing for something that looked like including Track D. Well, Your Honor, from 1855 to 1890, it wasn't in dispute that the record reflects. And from 1890, with the short survey, there's significant objections for the entire western half of the reservation that are well documented in the record. I mean, when the Crow Flathead Commission came out to negotiate with the Yakima Nation in the late 1890s, the Yakima Nation refused, saying that they wouldn't negotiate because the boundary issue hadn't been resolved. That's at 1791 and 2841 of the record. And White Swan testifies, who is an enrolled Yakima member, that at ER 2696, that the boundary extended 20 miles past Mount Adams. So I think that there is a significant record once you have the erroneous boundary that the Yakima Nation was objecting to the fact that Track D was not included within their reservation. Mr. Jones, there is a July 31, 1906 letter, however, at ER 2864, where it's signed by, or it appears to be signed by representatives of the nation, saying, we feel sure and certain that this is the line intended by the treaty, and that letter does not include Track D. Help us understand how we are to interpret that letter. Yes, Your Honor, so I think that, first of all, there are a number of individuals, a small handful, that the county relies on for statements about the southwestern boundary. There's Chief Spencer and Stick Joe and Abe Lincoln and White Swan and Captain Enius. Now, for Chief Spencer, Stick Joe, and Abe Lincoln, they weren't at the treaty council. So the key consideration here is, under the treaty canons, what would the Yakima Nation's ancestors have understood at the Walla Walla Treaty Council about what their treaty means? And they weren't at the Walla Walla Treaty Council, and, in fact, it's a factual finding of the district court that they were just repeating the statements of federal agents years after the Walla Walla Treaty Council. Now, White Swan and Captain Enius did claim to be at the treaty council, but every time that they are recorded in the record, including the letter that you're referencing, Your Honor, they record a different boundary. So with that sort of uncertainty, that can't overcome the clear evidence that we have from the Walla Walla Treaty Council itself. So applying the treaty canons of construction to the treaty, there are three key pieces of evidence. You have the treaty, you have the treaty minutes, and you have the treaty map. So starting with the treaty, as we discussed, it is ambiguous in its calls for the southwestern boundary, but it's not entirely ambiguous. We know that the western boundary must precede south of Mount Adams on the main ridge of the Cascades. We know the southern boundary is the Simcoe Mountains. And we know that we have to connect those two points, that southwestern boundary of the reservation, following a spur to a divide. Now, there is a spur leading off the south side of Mount Adams connecting to a continuous divide encompassing Track D that connects those two points. Now, this is supported by the treaty minutes. Now, the treaty minutes are the words that were actually spoken by Governor Stevens to the Acoma Nation's ancestors. And since the Acoma Nation's ancestors couldn't read the treaty, this is extremely important for understanding how the nation would have understood their treaty. And Governor Stevens said that, again, the western boundary extends south of Mount Adams on the main ridge of the Cascades, and that that connects to the southern boundary of the reservation, which is the Simcoe Mountains. And the only continuous feature that connects those two points is the boundary encompassing Track D. We also have the treaty map, and this is crucial. The treaty map is what was shown to the Acoma Nation's ancestors as Governor Stevens was describing their reservation. And the treaty map shows, first of all, there's a significant area of land immediately south of Mount Adams that is included within the Acoma Reservation. And it also shows that this land is entirely encompassed between the White Salmon River to the west and the Klickitat River to the east. The boundary encompassing the significant feature south of Mount Adams, which is Camas Prairie, between the White Salmon and the Klickitat Rivers, is Track D. So the Acoma Nation would have naturally understood their treaty to include Track D within the reservation. I would like to briefly address the 1904 Act. So under the Diminishment Framework, Congress has to clearly express an intent to change the Acoma Reservation's boundaries on the face of the statute before any such finding will be approved. And under McGirt v. Oklahoma, we know that you have to look at the text of the statute, and that is the only proper step for a court, that anything beyond that where you don't have ambiguous language would be an improper exercise in interpretation. Your counsel said that this isn't a... I'm having trouble with this word, but a diminishment case. Why do you say it is? This is a diminishment case, Your Honor, because even by the county's own admission at this point with their 2019 boundary, they are saying that Mount Adams was included in the Acoma Reservation in 1855, and they're saying that following the 1904 Act, it was not included in the reservation. The only way that Mount Adams is in the reservation in 1855 and not in the reservation following the 1904 Act is through an act of diminishment. They are also pointing, as this act, they are pointing to a Surplus Lands Act. And every time the Supreme Court has looked at a Surplus Lands Act to determine whether it, in fact, affected a change to a reservation's boundaries, they are applying this diminishment framework. So why wouldn't we just apply some more normal canon of statutory interpretation or a canon that resolves ambiguities in favor of the tribe or something rather than this diminishment, which seems like it's not a great fit for this situation? Well, Your Honor, I think that the statutory canons of interpretation specific to statutes that are related to Indians or having impacts on Indians is sort of baked into the diminishment framework. I don't think there's a significant difference between applying that canon and applying the diminishment framework. Because you would say it's not clear that, I mean, you would say the act isn't clear about taking away Tribe D anyway, right? So you would win under that kind of canon, too. So it sounds like you don't care which canon or which body of interpretive law we apply. Your Honor, the Yakama Nation would win this case under the diminishment framework, under the treaty abrogation framework, or just if you were to apply the statutory canons of construction related to statutes applicable to Indian tribes. So we are confident under any of those frameworks. If anyone is interested in that analysis, I'm happy to talk about that. But I would like to talk about the uniform understanding of the parties to the treaty. So both parties to the treaty agree that Tribe D was included in the Yakama Reservation in 1855 and that it remains within the Yakama Reservation today. And under Sumitomi Shoji America v. Avalliano, where you have a common understanding of the treaty parties as to what the treaty means, that common understanding should be given deference unless there is extraordinarily strong contrary evidence. And the county has not made such a showing of extraordinarily strong contrary evidence in this case. We also have the Indian Claims Commission's decision affirming that both parties to the treaty intended to include Tribe D within the reservation. Under United States v. Sioux Nation, that should be upheld unless clearly erroneous or unsupported the record. We are relying on that as persuasive precedent, and I think it's extremely persuasive precedent that this issue was litigated for 17 years before the Indian Claims Commission, and they reached the decision that Tribe D was intended to be included in the reservation. I mean, the county is asking this court to take a position that is contrary to positions taken in the record by the President of the United States, the Attorney General of the United States, the Department of Agriculture, the Department of the Interior, the Department of Justice, the Bureau of Indian Affairs, the Bureau of Land Management, the Environmental Protection Agency, United States Senators, United States Congressmen, the Indian Claims Commission, and the District Court. I mean, the county is a creature of the state of Washington, and the state of Washington is not supporting the litigation position of the county in this case. The county stands alone in its arguments. So, unless there are any other questions, Your Honor, I would respectfully request that this court affirm the District Court's finding that Tribe D is located within the Yakima Reservation established by the Treaty of 1855. Thank you. Thank you, Mr. Jones. Okay. We'll return here to the Palace Council on this issue. Thank you, Your Honors. I will do my best to be brief. The opposing counsel raised a number of issues, but I will start again by going back to Justice Gorsuch in McGirt, where, of course, the state of Oklahoma asserted that the government of Oklahoma and pretty much everyone else had treated half the state of Oklahoma as if it wasn't a reservation. But that did not determine the result of the case. It didn't matter. The magnitude of the legal wrong is no reason to perpetrate it, and that's, unfortunately, what we have here. We have a history of the United States time and time and time and time and time again screwing this up. But thank goodness we have the Ninth Circuit and our judicial system who gets to review these things de novo. You have the duty to look at these treaties and to look at these statutory acts and determine what the interpretation is under the applicable legal principles that are required by precedent. Counsel, don't we review the court's credibility findings under a completely different standard, however? Well, I think it's critical. Just like the Supreme Court said in Anderson, the district court can't shield its factual determinations by calling them credibility determinations. Here, our argument is statutory analysis, which is de novo. It is treaty analysis, which is de novo. Now, particular historical facts, predicate facts, those are clear error, and they have to be plausible in light of the total factual record. I hope that answers your question. Well, it does. But I guess what are we to do with the fact that Dr. Fisher gave the district court an ethno-historical basis to conclude that the Indians at the time of the treaty believed that Track B was within the reservation and the district court found Dr. Fisher credible? Anderson would still require that this court review that credibility determination and that witness testimony against the objective and documentary evidence in the record. And we posit that if you do that, you will find that Dr. Fisher's testimony is absolutely inconsistent with the documentary and objective record before this court. So we would disregard the district court's credibility finding? Anderson instructs this court to do that if it determines that on the objective record and the documentary evidence that that contradicts the district court's credibility finding, this court can still reverse factual determinations. Absolutely. But under a clear error standard, not under de novo. How can you reconcile with what you're saying with United States v. State of Washington? I'm not sure I understand the question. That case says that we apply a highly deferential, clear error standard to district court's findings of parties intent in entering Indian treaties. Oh, I agree. The district court's factual determination of understanding is a factual determination subject to clear error. But applying the treaty to that is a de novo review. It's a mixed questions of law and fact. In these cases, the courts always apply... I don't understand what that means. I mean, isn't the whole question, the parties intent in entering the treaty and what they thought they were doing, that's the thing we apply clear error to? No. The treaty interpretation of the plain language is de novo. And treaty interpretation as a whole is de novo. The predicate facts, the predicate facts that go into that, for instance, the district court found that the Pisco-Klickitat divide doesn't exist. That's a factual determination. It's also a clearly erroneous factual determination. That gets a clear error standard. But how that plays into the treaty interpretation is de novo. How it is applied in the interpretation of the treaty is de novo. And even if it were clear error, the district court's determination that the parties would have understood the treaty to include Glenwood Valley contradicts every single piece of evidence in the record of what the parties actually understood. I can talk about a number of them. Judge Otake brought up the July 1906 petition. That's just one example, one example where Yakima's principal spokespeople advocated for a particular boundary, and every time they did it, they excluded Glenwood from that claim. There's not a single claim in the record where anyone from the Yakima Nation prior to 1930 says Glenwood's included. And just to end, because I know I'm out of time, what I would request, and the county requests, that this court honor Congress's intent to settle this boundary once and for all. And in doing that, it will in turn honor Yakima Nation's own contemporaneous understanding of its boundary that it held for more than 75 years following the treaty. Thank you, Counsel. Unless Judge Freeland or Judge Otake have questions, I have none. So hearing no questions, I think we will thank both of the advocates for their strong and effective presentations. And we appreciate the advocacy, which helps us do our job. We shall now have this case submitted, and the parties will hear from us in due course. Thank you. Thank you, Your Honors.
judges: Gould, Friedland, Otake